[Cite as *Stanfield v. United States Steel Corp.*, 2013-Ohio-2378.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| LAURA B. STANFIELD | C.A. No.    12CA010213 |
| Appellant | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| UNITED STATES STEEL CORPORATION | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO CASE No.    11CV171493 |
| Appellee | |

DECISION AND JOURNAL ENTRY

Dated: June 10, 2013

CARR, Judge.

{¶1}    Appellant, Laura Stanfield, appeals the judgment of the Lorain County Court of Common Pleas granting summary judgment in favor of appellee, United States Steel Corp.  This Court reverses.

I.

{¶2}    On March 28, 2011, Laura Stanfield filed a complaint against United States Steel, alleging a violation of R.C. 4123.90 for retaliatory discharge of her employment because she filed a workers' compensation claim.  The complaint also included a claim for intentional infliction of emotional distress.  U.S. Steel filed an answer on April 27, 2011.

{¶3}    On February 6, 2012, U.S. Steel filed a motion for summary judgment.  Laura filed a brief in opposition to the motion on March 5, 2012.  The trial court issued a journal entry granting the motion on March 15, 2012.

{¶4}    On appeal, Laura raises two assignments of error.

II.

## **ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED ERROR IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS THAT THE EVIDENCE DID NOT DEMONSTRATE A PRIMA FACIE CASE OF RETALIATION.

{¶5} In her first assignment of error, Laura argues that the trial court erred in concluding that she failed to present a prima facie case for retaliation. This Court agrees.

{¶6} Civ.R. 56 is an "extraordinary" procedure that "represents a shortcut through the normal litigation process." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). This Court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 12 (6th Dist.1983).

{¶7} Pursuant to Civ.R. 56(C), summary judgment is proper if:

No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶8} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). *Id.* at 293. Once a moving party satisfies its burden of

supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ.R. 56(C), Civ.R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated at trial. *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449 (1996).

{¶9} R.C. 4123.90 states, in a relevant part:

> No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.

R.C. 4123.90 "embodies a clear public policy that employers not retaliate against employees who exercise their statutory right to file a workers' compensation claim or pursue workers' compensation benefits." *White v. Mt. Carmel Med. Ctr.*, 150 Ohio App.3d 316, 2002-Ohio-6446, ¶ 35. Courts analyze retaliatory-discharge claims under a burden-shifting framework, requiring the employee to initially set forth a prima facie case by showing the existence of an on-the-job injury that resulted in a workers' compensation claim and a causal connection between the claim and the employee's termination. *Scalia v. Aldi, Inc.*, 9th Dist. No. 25436, 2011-Ohio-6596, ¶ 14. "Once the plaintiff establishes each element of the prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the employee. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the reason offered for the termination is a pretext for retaliation." (Internal citation omitted.) *Id*.

{¶10} In this case, the trial court found that the evidence did not demonstrate a prima facie case of retaliation, nor did it demonstrate that Laura's discharge from U.S. Steel was

pretextual. The trial court further stated in its journal entry that "USS discharged [Laura] after concluding that she misrepresented both her ability to work and her medical condition. U.S. Steel reached this conclusion after viewing a surveillance video of [Laura] engaging in a variety of activities, conferring with Dr. Anthony regarding the video, reviewing [Laura's] medical records, and meeting with [Laura] and her union representatives." On appeal, Laura argues that there is a question of fact as to whether she was terminated in retaliation for filing a workers' compensation claim.

{¶11} U.S. Steel filed its motion for summary judgment on February 6, 2012. In support of its motion, U.S. Steel filed numerous exhibits, including Laura's deposition testimony, Kim Black-Brown's affidavit, Dr. James Anthony's affidavit, as well as a video of Laura at the Lorain County Fair. Laura filed her brief in opposition to the motion on March 5, 2012, and attached several exhibits in support thereof. Both parties cited extensively to Laura's deposition testimony, as well as the exhibits introduced at the deposition.

{¶12} Laura began working for U.S. Steel at its Lorain Tubular facility on July 29, 2008, where she worked as a utility technician in the lubrication department. Laura's responsibilities included lubricating machinery, fixing hoses, and performing general cleaning. Laura was a member of a union, and pursuant to the relevant collective bargaining agreement, U.S. Steel had a right to discharge employees for proper cause, and employees had a right to grieve improper discipline.

{¶13} On July 6, 2010, Laura was performing typical duties when she went down to the oil cellar to perform routine oil checks. When Laura began to climb the steps up to the platform of the north oil tank, she slipped on the second step from the bottom. As she began to fall backwards, Laura grabbed the handrail with her right arm and felt a "popping" in the area

between her shoulder and her elbow. Laura then experienced a burning sensation inside her arm. One of Laura's co-workers, Dee Krueck, accompanied Laura to the lube shanty where they could evaluate Laura's injury. Krueck observed a large bump on Laura's arm, and encouraged Laura to report the injury due to the fact it could be serious. Laura promptly located a manager and informed him about the incident.

{¶14} Kim Black-Brown, a senior analyst in the human resources department at U.S. Steel, stated in her affidavit that U.S. Steel places a premium on employee safety. Black-Brown averred that all employees who are injured at work are required to report their injuries so that U.S Steel can provide appropriate medical treatment and take any action to address dangerous working conditions.

{¶15} Laura was transported to a medical clinic by U.S. Steel Emergency Services where she was examined by the plant doctor, Dr. James Anthony. After Dr. Anthony diagnosed Laura with a torn bicep, he gave her Motrin, and sent her back to the plant. When Laura returned, one of the plant bosses sent her for drug and alcohol testing. Laura stated in her deposition that the ensuing test results were negative. After completing her tests, Laura then attended a meeting in the conference room of the bosses' trailer with the acting plant manager, the head of plant safety, several bosses, and two union representatives. Laura stated in her deposition that after reviewing the situation, the bosses were "appalled by the condition of the oil cellar," and they informed Laura that she had not done anything wrong.

{¶16} Prior to going home, Laura had a conversation with the head of security, who was identified only as "Spencer" at Laura's deposition. Spencer asked Laura if she would move to an office job on day shift in exchange for not claiming workers' compensation. When asked to elaborate on this discussion at her deposition, Laura stated, "Spencer asked me if I was going to

report this as Workman's Comp. or [if] they would keep me on the payroll and put me in the office on light duty." Spencer suggested accommodations could be made so that the situation did not become "a recordable incident." When asked if she understood what Spencer was saying, Laura responded, "Oh yes. * * * We were told that if we ever reported a Workman's Comp. claim we'd be fired." Laura identified one of her turn managers, Don Wallace, as the man who had made the statement. Laura further stated that she had never witnessed anyone report an injury during her time at U.S Steel. Laura indicated that Wallace stated on "numerous occasions" that if an employee filed a workers' compensation claim, the employee would be fired.

{¶17} U.S. Steel conducted an investigation into the incident, and a copy of the incident report was appended to their motion for summary judgment. The report concluded that Laura was wearing all of the required personal protective equipment at the time of the incident. The report further concluded that the "[s]teps were covered with an oil and water mix" and that the "[l]ighting could be improved." In regard to the design of the steps, the report noted that the "[steps for platform have a narrow pitch and the handrails are offset from each other." The report recommended that the platform should be replaced with an adequate design, the oil cellar should be cleaned, and that access to the platform should be restricted until the hazards were addressed.

{¶18} On the night of the incident, Laura went to the emergency room because she could not sleep due to the pain in her arm. Dr. Anthony had previously instructed Laura to go to the emergency room if the pain worsened. Like Dr. Anthony, the emergency room physician also concluded that Laura had a torn bicep. While Laura was given a prescription for Vicodin, she did not fill the prescription. Upon learning that Laura was injured at work, the emergency

room staff provided Laura with the paperwork that she believed to be forms for workers' compensation benefits. Laura subsequently turned the paperwork into her manager at work. Upon returning to work, Laura informed Dr. Anthony that she had been to the emergency room the night before, and that she was reluctant to take the Vicodin because it would render her unable to work. At her deposition, Laura stated, "I told [Dr. Anthony] that I could be home and be comfortable or be at work in pain. And he said that, being I was just going to sit in the office, then it would probably be okay to take [the Vicodin]." Dr. Anthony informed Laura that she should engage in "no use of the right arm, but may move right arm as tolerate for balance and support."

{¶19} In the ensuing weeks, Laura was moved to an office position, but she was given a limited numbers of tasks. Laura stated in her deposition that "nobody ever seemed to have anything for me to do." Dr. Anthony referred Laura to Dr. Frank Sabo at the Cleveland Clinic for treatment. On July 13, 2010, Laura visited Dr. Sabo and explained that she was experiencing pain going down her right arm whenever she tried to lift something. Dr. Sabo also recommended only light duty work, which entailed no lifting, pulling, or pushing with her right arm. After her appointment with Dr. Sabo, Laura met with Susan Wilhelm, who was a physician's assistant at the plant. Laura informed Wilhelm that she had experienced some numbness in her right hand. Wilhelm asked Laura to refrain from pushing or pulling anything over ten pounds, and to avoid raising her arm above chest level. Several days later, Laura placed a phone call to Wilhelm and stated she was experiencing increased numbness in her hand, and she also expressed concern that an MRI had not been ordered. Wilhelm then conferred with Dr. Sabo's office, and scheduled an MRI. Dr. Anthony averred that Wilhelm received the results on July 19, 2010, and that the MRI revealed a right intramuscular lipoma of the bicep, but no bicep tear.

{¶20} On July 19, 2010, Laura attempted to move away from light duty work and transition back to the mill. Laura stated in her deposition that she was not sure who exactly made the decision for her to return to the mill, but she did consult with Wilhelm who gave her "the okay" to do so. When asked if she could perform her duties, Laura responded in the negative, stating, "They had restrained my arm in a sling for a week. [They] [t]ook the sling away and put me out in the mill, I couldn't move my arm." Laura continued, "Don [Wallace] had me doing the filling up of the thrust bars, and it was [the] climbing of the steps I couldn't do. * * * [M]y arm wasn't lifting right to get up onto the handrails." When Laura informed Wallace that she was unable to perform her duties in the mill, she was placed back at an office job.

{¶21} On July 22, 2010, U.S. Steel hired a private investigator to conduct surveillance of Laura. On July 23, Laura received a letter from U.S. Steel stating that they were contesting her claim for medical services and that she would "be receiving additional information in the near future from the Ohio Bureau of Workers Compensation (BWC) in regards to this claim." The letter was signed by Kim Black-Brown. Laura met with Dr. Sabo on July 28, 2010, for a follow up examination, where she again was told to do only light duty activity. The following day, Laura met with Wilhelm at U.S. Steel's medical department. Wilhelm ordered Laura to refrain from lifting anything with her right arm, and to refrain from excessive pushing or pulling with her right arm. Subsequently, on August 16, 2010, Laura met with Dr. Sabo again and stated that she had numbness, tingling, and "vague pain" in her arm. The restrictions Laura received from Dr. Sabo consisted of "no lifting more than two pounds, no repetitive pushing, pulling and no climbing." Two days later, on August 18, 2010, Laura met with Dr. Anthony at the plant, and was again given restrictions similar to those given to her by Dr. Sabo. At the bottom of the physical examination report, Laura signed her name next to the statement, "the restrictions listed

by Dr. Anthony are exactly the same as my treating physician, Dr. Sabo." When asked at her deposition why this statement was included on the report, Laura responded "Dr. Anthony wanted it * * * to cover his butt." Laura further explained that Dr. Anthony and Dr. Sabo were "feuding with each other on what restrictions to hold me to." Because Dr. Sabo was recommending two pound restrictions and Dr. Anthony was recommending ten pound restrictions, Laura stated, "to this day, I don't know what restriction I was supposed to be following." In September 2010, after surveillance of Laura had commenced, Laura had follow-up appointments with Dr. Anthony and Dr. Sabo. Laura indicated that she continued to experience pain in her arm, and the restrictions previously placed on her remained in place. Laura continued working at an office position.

{¶22} With respect to the private investigator hired by U.S. Steel, surveillance of Laura commenced in August 2010. On August 3, 2010, Laura had an appointment with Dr. Paul Martin at the request of U.S. Steel. Laura indicated that the visit was related to her workers' compensation claim, and that U.S. Steel wanted another medical opinion. During this meeting, Laura informed Dr. Martin that one of her hobbies was showing and riding horses, and that she planned at being at the Lorain County Fair. Laura stated at her deposition that she told many people at U.S. Steel that she was attending the county fair, and she had to apply for vacation leave to attend. Upon learning that Laura would be at the county fair on August 29, 2010, U.S. Steel sent its investigator there to film Laura's activities. The video, which U.S. Steel attached in support of its motion, shows Laura climbing a ladder and using her right arm to cut down two portable fans that had been hung from the ceiling above the horse stalls. The fans had been tied to the ceiling with rope. In her deposition, Laura estimated that each fan weighed between three and three and a half pounds.

{¶23} Several managers and Dr. Anthony reviewed the video. After watching the video, Dr. Anthony began to question whether Laura had accurately represented her medical conditions and limitations. Dr. Anthony stated in his affidavit that he was "shocked" when he saw the video. Dr. Anthony expressed his concern that Laura may have been "representing symptoms far more serious than was apparent on the surveillance video." Based on the video, Dr. Anthony's opinion, and a review of Laura's medical history, U.S. Steel determined that Laura had misrepresented her medical condition. On September 29, 2010, Laura received two separate five-day suspensions for misrepresenting her medical condition and misrepresenting her ability to work. That day, Adam Armendariz pulled Laura aside at the plant and handed her two disciplinary action forms which outlined the suspensions. Security guards then escorted Laura to her car. Subsequently, on October 4, 2010, Laura met with her union representative and several managers to address the discipline and discuss the video. Laura emphasized during the meeting that when she attempted to return to assignments outside the office, she "couldn't do it" due to physical limitations, and she would experience "burning in her arm again." Armendariz, a department manager for U.S. Steel in charge of personnel and labor relations, asked Laura if she could see anything wrong with her actions. Samuel Downs, a labor relations representative for U.S. Steel, averred that Laura responded to this question by stating that she could "see how I may have over done it."

{¶24} In recalling the October 4, 2010 meeting at her deposition, Laura stated that Armendariz was "really mad and screaming" at her. As he screamed at Laura, Armendariz "was all red in the face with veins sticking out of his neck[.]" Armendariz accused Laura of "lying about everything," and stated that he was under the impression she was "a one-armed person that couldn't do the job." Following the October 4, 2010 meeting, Laura was informed that her

suspensions would be converted to discharge. The union subsequently filed a grievance on behalf of Laura. On December 15, a subsequent meeting was held between Laura, her union representative, and U.S. Steel management to address the discipline under BLA's grievance procedures. U.S. Steel affirmed its position of converting Laura's suspensions to discharge following the second step meeting.

{¶25} In regard to the workers' compensation claim, Laura stated in her deposition that Spencer and Black-Brown were the only two individuals with whom she discussed filing a workers' compensation claim, and she was not aware of who ultimately became aware that she had filed a claim. U.S. Steel formally informed Laura by letter dated July 23, 2010 that it was rejecting the validity of her claim. When asked if she thought her termination was unfair, Laura responded that it was "[v]ery unfair" because she "did nothing wrong."

{¶26} When viewing the facts in the case in the light most favorable to the non-moving party, the trial court erred in concluding that Laura could not possibly succeed on her wrongful termination claim. Laura was injured while working under dangerous conditions in the oil cellar. While Kim Black-Brown averred the U.S. Steel valued the safety of its employees and did not discourage the filing of workers' compensation claims, Laura stated in her deposition that she had been told by Don Wallace, one of her shift managers, that merely filing a workers' compensation claim could result in termination. On the day she suffered her injury, Laura was told that she could be moved to an office position so that her injury would not become a "recordable incident." Laura's injury was initially misdiagnosed as a torn bicep by two separate physicians, and there is competing evidence regarding the extent to which Laura was prevented from fulfilling her work responsibilities. While U.S. Steel relies heavily on footage of Laura at the Lorain County Fair engaging in physical activity with her right arm, the degree to which this

activity was physically taxing is unclear. We note that it is improper for a trial court to weigh evidence on the merits and determine issues of credibility in ruling on a motion for summary judgment. *Jones v. Birney*, 9th Dist. No. 07CA009171, 2008-Ohio-2250, ¶ 24. Upon learning of the video, Laura was called into a meeting where Adam Armendariz became extremely angry, screamed at Laura, and referred to her as "a one-armed person that couldn't do the job." Her initial suspensions were subsequently converted into discharge. Under these circumstances, it was improper for the trial court to grant summary judgment in favor of U.S. Steel. when questions of material fact remained as to whether Laura was fired because she filed a worker's compensation claim after the July 6, 2010 incident in the oil cellar.

{¶27} Laura's first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED ERROR IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS THAT THE EMPLOYER'S CONDUCT WAS NOT EXTREME AND OUTRAGEOUS.

{¶28} In her second assignment of error, Laura argues that the trial court erred in granting summary judgment on her second claim on the basis that U.S. Steel's conduct was not extreme and outrageous.

{¶29} "In a case for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt.*, Inc., 71 Ohio St.3d 408, 410 (1994). "Termination of employment, without more, does not constitute the outrageous conduct required to establish a claim of intentional infliction of emotional distress, even when the employer knew that the decision was likely to upset the employee." (Internal

quotations and citations omitted.) *Gradisher v. Barberton Citizens Hosp.*, 9th Dist. No. 25809, 2011-Ohio-6243, ¶ 6.

**{¶30}** As noted above, there are several issues of material fact in this case surrounding the circumstances of Laura's termination, as well as the scene that unfolded at the meeting on October 4, 2010. Laura stated at her deposition that Armendariz was "all red in the face with veins sticking out of his neck" as he screamed at Laura, accused her of lying about everything, and referred to her as "a one-armed person that couldn't do the job." When asked if she had suffered any emotion harm, Laura responded that she had been "a basket case" and that she never wanted to leave the house. Laura further explained that she had broken out in rashes and hives, and that the stress caused her to "sleep all the time." Laura further stated that she was taking Zoloft and Atarax to cope with the "stress and anxiety." Because there are issues of material fact surrounding the circumstances of Laura's departure from U.S. Steel, as well as the extent to which she had suffered emotional distress due to the way she was treated by management at U.S. Steel, it was improper for the trial court to conclude that U.S. Steel's conduct was not extreme and outrageous.

**{¶31}** Laura's second assignment of error is sustained.

### III.

**{¶32}** Laura's assignments of error are sustained. The judgment of the Lorain County Court of Common Pleas is reversed.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

---

DONNA J. CARR
FOR THE COURT

BELFANCE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

MARGARET O'BRYON, Attorney at Law, for Appellant.

RODNEY M. TORBIC, Attorney at Law, for Appellee.

JEFFREY H. WEIR II, Attorney at Law, for Appellee.