[Cite as *Silvers v. Clay Twp. Police Dept.*, 2018-Ohio-2970.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

TINA SILVERS                                     :
                                                 :
    Plaintiff-Appellant                  :    Appellate Case No. 27867
                                                 :
v.                                               :    Trial Court Case No. 15-CV-73
                                                 :
CLAY TOWNSHIP POLICE                             :    (Civil Appeal from
DEPARTMENT, et al.                               :     Common Pleas Court)
                                                 :
    Defendants-Appellees                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of July, 2018.

. . . . . . . . . . .

GREGORY TURNER Atty. Reg. No. 0073859, 207 S. Main Street, P.O. Box 339, Englewood, Ohio 45322
    Attorney for Plaintiff-Appellant

JEFFREY C. TURNER, Atty. Reg. No. 0063154, DAWN M. FRICK, Atty. Reg. No. 0069068, and CHRISTOPHER T. HERMAN, Atty. Reg. No. 0076894, 8163 Old Yankee Street, Suite C, Dayton, Ohio 45458
    Attorney for Defendants-Appellees, Clay Township, Clay Township Board of Trustees, Clay Township Police Department, and John Van Gundy

LAWRENCE E. BARBIERE, Atty. Reg. No. 0027106 and KATHERINE L. BARBIERE, Atty. Reg. No. 0089501, 5300 Socialville Foster Road, Suite 200, Mason, Ohio 45040
    Attorneys for Anthony Scott, Defendant-Appellee

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tina Silvers appeals from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of Anthony Scott and John VanGundy on Silvers's state-law claims of sex discrimination and sexual harassment under R.C. Chapter 4112, common law sexual harassment, and intentional infliction of emotional distress. She also appeals from a judgment in favor of Clay Township and the Board of Trustees of Clay Township (collectively, the "Clay Township Defendants") on those same claims, as well as a claim of negligent hiring and/or retention.

{¶ 2} Silvers claims that the trial court erred in granting summary judgment for all defendants on her claims of common law sexual harassment and intentional infliction of emotional distress. She also claims that summary judgment was inappropriate for the Clay Township Defendants on her claim of negligent hiring/retention. Silvers does not challenge the summary judgment ruling on her statutory sexual harassment and sex discrimination claims.

{¶ 3} For the following reasons, the trial court's judgments will be affirmed.

## I. Background and Procedural History

{¶ 4} Construing the evidence in the light most favorable to Silvers, the record reveals the following facts.

{¶ 5} Silvers graduated from the Great Oaks Police Academy in December 1997. She worked for several police departments and in private security positions before joining the Clay Township Police Department (CTPD) in August 2007. Silvers had previously dated Don Perkins, who was then-chief of CTPD, and she joined CTPD as an auxiliary officer, an unpaid position, at Chief Perkins's suggestion. Auxiliary officers were required

to undergo field training, and then-Officer John VanGundy was assigned as Silvers's Field Training Officer ("FTO"). At that time, Silvers had a good relationship with VanGundy. Silvers did not complete her field training due to medical issues, and in December 2008, Silvers resigned because of an injury at another job. Silvers considered her first term of employment with CTPD to be a good experience.

{¶ 6} Silvers remained friendly with VanGundy after her resignation, and they occasionally texted and talked. Although they never had a sexual relationship, at one point in 2010, Silvers and VanGundy exchanged nude photographs; VanGundy kept a printout of the photograph of Silvers in a folder in his desk drawer at work, along with other sexually explicit photos of other women with whom he claimed to have had sex. According to VanGundy, he did not see or communicate with Silvers for much of 2012.

{¶ 7} Later in 2012, then-Detective VanGundy suggested to Silvers that she return to work at CTPD. When VanGundy met with Silvers in his office about her potential return to CTPD, he pulled the folder containing the sexually explicit photos out of his desk. He took his photo of Silvers from the folder, said he now trusted her, but did not trust the other women, and shredded Silvers's photo in her presence. VanGundy also indicated that he could make sure that Silvers got a job, but that she would have to "give it up" if she were hired. VanGundy had previously told Silvers that his "bucket list" included having sex with an older woman.[1]

{¶ 8} After VanGundy's statements, Silvers applied for a CTPD position. She understood that police officers were hired by the Board of Trustees, but the Trustees

---

[1] We have found nothing in the record to specify the age difference between Silvers and VanGundy, although this statement, construed in Silvers's favor, suggests that VanGundy was younger than Silvers.

generally followed the recommendation of the chief.

{¶ 9} Silvers was rehired by CTPD as an auxiliary officer on October 10, 2012, and she was required to complete a field training program; Officer Anthony Scott was assigned as her FTO. According to Chief Perkins, field training had a guideline of 240 hours of "on-the-road" training, although some officers could complete their training in fewer hours. Due to her prior employment with CTPD, Perkins expected Silvers to complete her training in under 240 hours; upon completing training, Silvers would be qualified for a paid position. Silvers did not receive credit toward training for doing paperwork around the office or other assignments within the office.

{¶ 10} Chief Perkins retired on December 29, 2012. By that time, VanGundy had been promoted to Lieutenant, and Scott had been promoted to Sergeant. Prior to Perkins's departure, Silvers did not experience any significant problems with Scott or VanGundy. Scott and VanGundy were placed in charge until a new safety director was hired. John Simmons was hired as Safety Director, serving a dual role as Chief of Police, in February 2013.

{¶ 11} Silvers alleged that, after Chief Perkins's retirement, Scott and VanGundy began subjecting her to a sexually hostile work environment in which she was treated differently than male officers. Silvers further alleged that Simmons joined Scott and VanGundy in this treatment and allowed Scott and VanGundy to continue in it.

{¶ 12} Silvers identified several instances where she felt she was treated poorly by Scott and VanGundy. In March 2013, Silvers used the restroom at work and had blood in her urine. Silvers informed VanGundy of the situation and that she needed to go to the hospital. VanGundy told her that they needed to tell her sergeant (Scott), and they

located Scott at the CTPD garage with Simmons and another officer. VanGundy shouted to Scott that Silvers was "pissing blood" and needed to go home. Scott responded, "Are you sure it's not your monthly?" Silvers replied, "I think I'd know the difference" and left for the hospital. Subsequent to this event, Scott repeatedly commented to Silvers, "My name is Tina and my pussy hurts."

{¶ 13} In July or August 2013, new uniform pants were ordered for the officers. Scott asked Silvers what size panties she had ordered; Silvers responded with her pants size. Around the same time, Scott asked Silvers, in front of other officers, if she "wiped her ass" the same as the rest of them, front to back or side to side, and whether that was the "funk" he smelled.

{¶ 14} Also in July or August 2013, Silvers was working a traffic detail on Interstate 70 when a Jeep rear-ended a flatbed truck and became sandwich between the truck and a semi. Silvers notified the CTPD dispatcher and the Brookville police department; Scott was the first to arrive. Scott did not have his radio, and he grabbed Silvers's radio off her chest and was "pulling [Silvers] around" until Silvers gave her radio to him. Silvers was told to relocate her cruiser and to go down the highway to move cones to get traffic around the accident. When she was in the process of moving cones, Scott "jump[ed] up and down" and was "screaming and hollering." (Silvers Dep. at 144-145.) When Silvers went back to see what Scott wanted, Scott told her to "get back in your f**king car. F**king idiot." (*Id.* at 145.)

{¶ 15} Scott tried to write-up Silvers for missing work when her sister passed away from cancer and her absence had been approved in advance. Silvers stated in her deposition that she lost weight after her sister died of cancer. In her affidavit, she

attributes much of her 30-pound weight loss to the harassment. After Silvers began losing weight, Scott asked, "What's the matter, do you have cancer or something?"

{¶ 16} On September 5, 2013, Scott ordered Silvers to pick up a prisoner in Preble County. When she arrived, she had to wait for a Lewisburg unit to bring the prisoner. However, contraband was found on the prisoner, so the prisoner remained in Preble County and the pick-up did not occur. Silvers drove back to CTPD, and Scott demanded she perform other work without a meal break. Silvers took a meal break, did a couple traffic stops and some vacation house checks, and returned to CTPD. Upon her return, Scott screamed at her that she "put all of this mileage on [his] car and used [his] gas, and [she] didn't do traffic stops and only did three vacation house checks and not seven or eight. This is terribly unprofessional and unacceptable." Scott further yelled that "this [was] f**king unacceptable," that she "had enough time for this shit," and "why don't you just tell me I'm sorry, sir, and I'll fucking do better next time?" (Silvers Dep. at 158-159.) Silvers tried to explain the problems she encountered that evening, and Scott kicked a trash can that hit her leg. Silvers stated in her deposition that she was so upset about the trash can incident that she forgot about mandatory training scheduled for September 11 for which she had signed up.

{¶ 17} Silvers did not inform the Clay Township Trustees about any of the incidents at CTPD. Silvers wanted to report Scott's behavior to the Trustees, but was denied the opportunity to do so. After Simmons was appointed Safety Director, officers were required to submit a written request to speak with Trustees on a pre-printed form that was kept in the road room. Simmons testified in his deposition that a written request addressed to him was required for any officer to see the Trustees. While there was no

written policy requiring the requests to go through Simmons, he confirmed that that was the practice in place. Silvers completed the form twice requesting to meet with the Trustees, once in March 2013 and once in July or August 2013. Simmons told her she was denied from seeing the Trustees.

{¶ 18} At some point after the highway accident, Silvers interviewed with the Brookville Police Department. (Silvers stated that she had told Scott and Simmons about the opportunity, and they both encouraged her to go. Silvers Dep. at 165.) According to Silvers, during the interview, Brookville Chief of Police Doug Jerome "just come right out and asked me — he said, I just need to ask you this: Was you that female on the highway?" Silvers was embarrassed and admitted that she was, and she confided some of the problems she was experiencing with CTPD. Silvers asserted, however, that she did not disparage the department. She further stated that she did not want Jerome to communicate her statements to CTPD.

{¶ 19} Sometime afterward, Simmons and Jerome rode together to a meeting, and Jerome told Simmons that he (Simmons) should have a conversation with Silvers about things that were going on with her at work. Simmons described this conversation as revealing that Silvers "disparaged the [CTPD] field training to another police agency." This prompted Simmons to approach Silvers and say "We need to talk about some of the things that you're going through but you're going to have to follow your chain of command." (Silvers Dep.) According to Silvers, because Silvers's "chain of command" was Scott and Simmons, who had previously denied her from seeing the Trustees, she responded, "It is what it is." (*Id.* at 169-170.)

{¶ 20} On September 16, 2013, Scott wrote a final evaluation report, which was

critical of Silvers. The same day, he wrote a memorandum to Simmons requesting that Silvers be "probationary released." Silvers was terminated on September 18, 2013.

{¶ 21} The next day, Silvers filed a complaint with the Ohio Civil Rights Commission (OCRC), which was also filed with the U.S. Equal Employment Opportunity Commission (EEOC). On July 17, 2014, the OCRC issued a letter of determination, finding that Silvers was released during probation for performance issues. The OCRC found no probable cause for the Commission to issue a complaint against CTPD for an unlawful discriminatory practice. On October 7, 2014, the EEOC adopted the findings of the OCRC.

{¶ 22} Simmons separately investigated Scott's conduct after Silvers filed her OCRC complaint. Simmons believed Scott's behavior related to the highway accident was "egregious enough" to warrant more than a verbal or written warning. (Simmons Dep. at 78.) A hearing was held before the Board of Trustees on October 15, 2013. It was determined that Scott violated CTPD Policy and Procedure 1.02 (unbecoming conduct). Scott was demoted from sergeant to officer, placed on probation for one year, and required to attend anger management and sensitivity training.

{¶ 23} The record reflects that, prior to his most recent employment with CTPD, Scott resigned from the Brookville Police Department in lieu of receiving a probationary release; Scott stated in his deposition that he was "too aggressive for the City of Brookville." (Scott Dep. at 9.) In July 2010, the Brookville Chief wrote on CTPD's reference form that Scott was "aggressive patrol" and not eligible for rehire. At one point prior to Chief Perkins's retirement, Scott received discipline from CTPD related to an off-duty incident at a dog park where Scott drew his service weapon on (but did not shoot) a

dog that was fighting with his dog; Scott pled guilty in court to disorderly conduct related to that incident.

{¶ 24} On January 6, 2015, Silvers filed a complaint in the Montgomery County Court of Common Pleas against CTPD, VanGundy, Scott, and the five trustees of Clay Township. She claimed (1) sex discrimination and sexual harassment in violation of R.C. Chapter 4112, (2) sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1990, (3) procedural and substantive due process violations under the United States Constitution, (4) violation of her Equal Protection rights under the United States Constitution, (5) common law sexual harassment; (6) negligent hiring and retention of VanGundy and Scott, (7) intentional infliction of emotional distress, (8) negligent infliction of emotional distress, and (9) municipal liability. VanGundy and Scott were named in their individual and official capacities. Her amended complaint, filed February 5, 2016, alleged the same claims and added Simmons as a party-defendant.

{¶ 25} On March 4, 2015, the case was removed to federal district court. While the case was pending in federal court, Silvers filed a second amended complaint, naming Clay Township, Board of Trustees of Clay Township, VanGundy, Scott, and Simmons as defendants. The second amended complaint omitted the due process claim and the negligent infliction of emotional distress claim.

{¶ 26} All defendants moved for summary judgment. On October 28, 2016, the federal district court granted summary judgment to all defendants on Silvers's Title VII sex discrimination and sexual harassment claims, as well as her claims under the U.S. Constitution. As to the sex discrimination claims, the court concluded that Silvers failed to establish a prima facie case of discrimination, because she did not demonstrate that

she was qualified for a full- or part-time position. The court noted that, even if she had been able to satisfy that burden, her claim would still have failed because "she has no evidence to disprove the stated non-discriminatory reason for not hiring [her]." The district court also granted summary judgment on Silvers's sexual harassment claim, concluding that the alleged incidents "simply do not rise to the level of severe or pervasive."

{¶ 27} The district court declined to exercise supplemental jurisdiction over Silvers's state law claims, and it remanded the matter to state court. In March 2017, Silvers filed a motion in the Montgomery County Common Pleas Court to reactivate the case.

{¶ 28} On June 23, 2017, Scott filed a motion for summary judgment on Silvers's state law claims. VanGundy and the Clay Township Defendants also filed a joint motion for summary judgment. Silvers opposed the motions. She conceded that, due to the federal district court's judgment, the doctrines of res judicata and/or collateral estoppel barred her sex discrimination and sexual harassment claims under R.C. Chapter 4112. She asserted, however, that those doctrines did not affect her common law sexual harassment, intentional infliction of emotional distress, or negligent hiring and retention claims.

{¶ 29} Prior to rulings by the trial court on the summary judgment motions, Silvers dismissed Simmons from the action, with prejudice.

{¶ 30} On November 7, 2017, the trial court granted Scott's, VanGundy's, and the Clay Township Defendants' motions for summary judgment. Silvers appeals from the trial court's rulings.

## II. Summary Judgment Standard

{¶ 31} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264 (1996).

{¶ 32} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Dresher* at 293. Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 33} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

### III. Negligence: Common Law Sexual Harassment

{¶ 34} In her second amended complaint, Silvers claimed that "Defendants had a common law duty to exercise reasonable care to prevent and correct any sexual harassment of employees by Clay Township and Clay Township Police Department by supervisors." She alleged that VanGundy and Scott verbally and physically sexually harassed her, and that their actions were foreseeable. Further, she alleged that "Defendants placed Lieutenant VanGundy and Sergeant Scott, without proper inquiry and without proper training, in a position to exercise actual or apparent authority over Ms. Silvers, and failed to exercise reasonable care to train employees of Clay Township Police Department to prevent, report, and correct sexually harassing behavior."

{¶ 35} The Ohio Supreme Court recognized the common law tort of sexual harassment in *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 575 N.E.2d 428 (1991). *Kerans* failed to provide the elements of the tort of sexual harassment, but appellate courts have applied the elements of a R.C. Chapter 4112 sexual harassment claim. *E.g.*, *Harmon v. GZK, Inc.,* 2d Dist. Montgomery No. 18672, 2002 WL 191598, * 8 (Feb. 8, 2002), citing *Seiber v. Wilder*, 2d Dist. Greene No. 94 CA 32, 1994 WL 558969 (Oct. 12, 1994).

{¶ 36} To establish a claim of hostile-environment sexual harassment under R.C. Chapter 4112, a plaintiff must show "(1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory

personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 176-177, 729 N.E.2d 726 (2000).

{¶ 37} "In order to determine whether the harassing conduct was 'severe or pervasive' enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." *Id.* at paragraph five of the syllabus. Relevant circumstances may include (1) the frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interfered with an employee's work performance. *Id.* at 180.

{¶ 38} For a common law sexual harassment claim, many courts have also required plaintiffs to prove the additional element that "the employee has a past history of sexually harassing behavior about which the employer knew or should have known." *Kilgore v. Ethicon Endo-Surgery, Inc.*, 172 Ohio App.3d 387, 2007-Ohio-2952, 875 N.E.2d 113, ¶ 35 (1st Dist.). Silvers claims that this additional requirement should not apply, because the alleged harassment was committed by her direct supervisor, Scott.

{¶ 39} At the outset, Silvers acknowledges in her appellate brief that a claim for common law sexual harassment requires the plaintiff to establish the elements set forth in *Hampel*, i.e., the same elements as for a statutory hostile environment sexual harassment claim. Silvers did not oppose the motions for summary judgment on her statutory sexual harassment claims under R.C. Chapter 4112. The trial court granted

summary judgment to all defendants on Silvers's sexual harassment claims under R.C. Chapter 4112, and Silvers has not challenged that ruling on appeal. Silvers asserts, but does not explain, how her common law sexual harassment claim differs from her statutory claim, such that the common law claim should survive whereas her statutory claim fails.

{¶ 40} Regardless, we agree with the trial court that Silvers has not demonstrated a genuine issue of material fact that the conduct of which she complains was "severe or pervasive" as those terms have been defined. In reaching its conclusion, the trial court relied on and quoted the reasoning provided by the federal district court in granting summary judgment on Silvers's Title VII sexual harassment claim. The district court stated:

> Plaintiff's Second Amended Complaint accuses VanGundy of two incidents – the incident in his office where prior to being appointed as Auxiliary Officer, VanGundy said she would have to "put out" if taken on and the "pissing blood" incident. The first of these incidents, an unfulfilled quid pro quo demand, is part of Plaintiff's hostile work environment claim. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct."). Plaintiff also asserts Scott on "numerous occasions" mimicked her saying, "My name is Tina and my pussy hurts." She alleges that he called her an "idiot," modified with an expletive. She claims that he mocked her weight loss, recalling Plaintiff's sister's death from cancer. She claims that he crassly used a metaphor concerning personal hygiene.

She describes that he spoke with expletives to her on her last day. All of this over the course of nearly a year.

The Court is mindful that, rather than considering each event complained of in isolation, it must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive. *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997). Specifically, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris [v. Forklift Sys., Inc.]*, 510 U.S. [17, 23 (1993)]. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Court may consider the effect of the incidents on the employee's psychological well-being. *Harris*, 510 U.S. at 23. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Even incidents occurring consistently over a period of four months, are "merely offensive" and are insufficient to support liability. *Black v. Zaring Homes, Inc.*, at 826; see *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir.2000); see also *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-65 (6th Cir. 2000) and *Mahan v. Peake*, No. 07-15223, 2009 WL 174130, at *6 (E.D. Mich. Jan. 23, 2009).

Considering all of the incidents Plaintiff describes as allegations of

sexual harassment, they simply do not rise to the level of severe or pervasive necessary to succeed on a cause of action. There is no evidence that Plaintiff's interactions on the highway would not have occurred "but for" Plaintiff's gender. See *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) ("[plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.' *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)"). On its face, the highway incident was a supervisor upset at his trainee.

Similarly, Plaintiff has not pointed to a single incident wherein a male employee was treated differently after the death of a loved one. While exceedingly boorish, it has not been linked to Plaintiff's gender. Neither are crass metaphors concerning how one cleans oneself necessarily motivated by gender.

Silvers does assert that male officers were not treated as poorly as her, basing this on her observing Scott yell at Officer Hodge a few times. This, however, is actually similar to what she describes of herself. Silvers Dep., Doc. 28-2, PageID 556. Moreover, absent a foundation of misconduct or under-performance in her presence, there is a lack of personal knowledge on Silvers's part regarding what transpired between Scott and other officers outside of her presence.

Even if these incidents were gender motivated, combining them with Plaintiff's other comments, including VanGundy's insistence that Plaintiff "would have to put out" if hired and Scott's incessant incantation, "My name

is Tina and my pussy hurts," they do not rise to the level of a hostile work environment.

The trial court agreed with the federal district court's analysis and found that the Clay Township Defendants, VanGundy, and Scott were entitled to summary judgment on Silvers's common law sexual harassment claim. The trial court found that "the incidents complained of were not sufficiently severe or pervasive to alter the conditions of [Silvers's] employment and create an abusive working environment."

{¶ 41} Construing the evidence in the light most favorable to Silvers, Silvers has presented evidence that Scott grabbed her by her radio at the accident scene, twice cursed at her, kicked a trash can toward her, made an extremely insensitive comment about her weight loss, and made other crude comments. Silvers also presented evidence that VanGundy insensitively addressed the situation when she had blood in urine. However, considering the totality of the circumstances, we cannot find that a genuine issue of material fact exists as to whether the offending conduct rises to the level of "severe or pervasive" harassment, as defined by Supreme Court authority. As stated by the United States Supreme Court, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275, 141 L.Ed.2d 662. We acknowledge that sexual harassment cases are fact-specific and cannot be resolved with mathematical precision. Nevertheless, even construing the facts in Silvers's favor, given the current authority on "severe or pervasive" conduct, the trial court properly granted summary judgment to all defendants on Silvers's common law sexual harassment claim.

### IV. Intentional Infliction of Emotional Distress

{¶ 42} Count Six of Silvers's second amended complaint alleged intentional infliction of emotional distress. She alleged that the "conduct of Defendants" was extreme and outrageous and caused her severe emotional distress. In her memorandum in opposition to summary judgment, Silvers focused solely on Scott's behavior. She also discusses only Scott's behavior on appeal. Accordingly, we summarily affirm the trial court's grant of summary judgment in favor of VanGundy on this claim, and we will focus solely on Scott's behavior.

{¶ 43} "One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983), syllabus, abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051.

> "In order to recover damages for the intentional infliction of serious emotional distress, four elements must be proved: a) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; b) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; c) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and d) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it."

*Thomas v. Progressive Casualty Ins. Co.*, 2011-Ohio-6712, 969 N.E.2d 1284, ¶ 12 (2d Dist.), quoting *Pyle v. Pyle*, 11 Ohio App.3d 31, 463 N.E.2d 98 (8th Dist.1983), paragraph two of the syllabus.

{¶ 44} A claim for intentional infliction of emotional distress must be based on more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager* at 375; *Rogers v. Olt*, 2d Dist. Miami No. 2017-CA-21, 2018-Ohio-2110, ¶ 26. The Ohio Supreme Court has explained:

> "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. *See* Magruder, Mental and Emotional Disturbance in the Law of Torts, [49] Harvard Law Review 1033, 1053 (1936). * * * "

*Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153, 462 N.E.2d 392 (1984), quoting Comment d to Section 46 of the Restatement of the Law 2d, Torts (1965) 71, 73.

{¶ 45} In her memorandum in opposition to Scott's motion for summary judgment, Silvers describes Scott's offending behavior as follows:

> In front of multiple police officers, firefighters, and motorists, Scott yanked a microphone from Silvers and pulled her with it, screamed she was a "fucking

idiot" and to "get back in your fucking car." Silvers Dep. 143-45. Simmons described Scott's behavior as so "egregious" that he was demoted for that incident. Simmons Dep. 77-78. But that was only one of many incidents. After losing her sister to cancer, Scott addressed her weight loss as "do you have cancer or something?" Silvers Aff. ¶ 5. While yelling at and berating Silvers, Scott kicked a trash can that hit her. Silvers Dep. 158-59. After she informed Defendants she was urinating blood, Scott mocked her on "numerous" occasions saying "my name is Tina and my pussy hurts." *Id.* at 238-39.

**{¶ 46}** In granting summary judgment to Scott, the trial court reasoned:

After a review of the depositions and affidavits filed, the Court finds that the comments complained of were crude, but not beyond all possible bounds of decency. Further, there is no evidence that Plaintiff suffered severe emotional distress as a proximate result of Scott's conduct. Plaintiff, in her deposition, stated she had not gotten any treatment or counseling for any issues since she was released as an auxiliary officer. She later claims in her affidavit that she suffered severe emotional distress. She states she went to the hospital several times, but offers no information as to why she went to the hospital. The Court finds that Scott is entitled to summary judgment on the intentional infliction of emotion distress claim.

**{¶ 47}** On appeal, Silvers argues that the trial court erred in concluding that Scott's conduct did not rise to the level of extreme and outrageous. She argues that courts have denied summary judgment where conduct was far less outrageous or egregious than

Scott's, citing *Stanfield v. United States Steel Corp.*, 9th Dist. Lorain No. 12CA10213, 2013-Ohio-2378; *Reamsnyder*, 10 Ohio St. 3d 150, 462 N.E.2d 392, and *Nicolazzo v. Yoingco*, 149 Ohio Misc.2d 44, 59, 2007-Ohio-7269, 898 N.E.2d 94 (Clermont C.P.2007). In addition, Silvers contends that there was evidence that she suffered severe emotional distress and sought medical treatment due to Scott's conduct.

{¶ 48} Initially, we agree with Silvers that there is a genuine issue of material fact as to whether she suffered "severe mental anguish." Silvers stated in her affidavit, "As a result of the hostile work environment, sexual harassment, and denial of paid positions, I suffered severe emotional distress. I experienced anxiety and rapid weight loss. In the late spring of 2013, I lost over thirty pounds. I went to the hospital several times." Silvers Aff. at ¶ 7. In interrogatories, Silvers was asked to identify where she had received treatment for physical or mental complaints or conditions related to the incidents alleged in her complaint; she responded that she had sought medical treatment from Good Samaritan Hospital and possibly Wright Patterson Medical Center.

{¶ 49} We note that there is some evidence in the record that creates arguable questions about whether Silvers did, in fact, suffer severe mental anguish. The record does not contain details of her hospital treatment; Silvers's answer regarding hospital treatment could be referring to her treatment for blood in her urine, as opposed to emotional distress. In addition, many of the events of which Silvers complains occurred after late spring 2013, suggesting that the weight loss may be more associated with her sister's death than any harassment. Nevertheless, at the summary judgment stage, we must construe the evidence in the light most favorable to Silver. Doing so, we cannot conclude, as a matter of law, the Silvers did not suffer severe emotional anguish.

{¶ 50} Regardless, the conduct of which Silvers complains does not constitute extreme and outrageous conduct as that term is currently defined by the Supreme Court. The Supreme Court has emphasized that "extreme and outrageous" is a high standard, which is not reached with "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager*, 6 Ohio St.3d at 375, 453 N.E.2d 666. Accepting as true that Silvers was cursed and yelled at by Scott and that he made the comments about her weight, pants size, and bleeding, Scott's alleged conduct, while offensive, ugly, and disrespectful, did not "go beyond all possible bounds of decency" such that it "can be considered as utterly intolerable in a civilized society." *Id.*

{¶ 51} We find the cases cited by Silvers to be distinguishable. In *Stanfield*, 9th Dist. Lorain No. 12CA10213, 2013-Ohio-2378, the plaintiff brought claims of retaliatory discharge due to her filing of a workers' compensation claim and intentional infliction of emotional distress. The trial court granted summary judgment to her employer on both claims. The Ninth District reversed on both claims, finding that questions of material fact remained as to whether the employee was fired because she filed a worker's compensation claim and the extent to which she suffered emotional distress due to the way she was treated by management.

{¶ 52} *Reamsnyder*, 10 Ohio St.3d 150, 462 N.E.2d 392, which was decided shortly after *Yeager*, involved statements made by a rental agent for a rental car company, which provided a vehicle to the plaintiff's wife after an automobile accident. In telephone conversations with the plaintiff, the agent threatened to tear the plaintiff's face off and informed the plaintiff that the rental car had been reported to the police as stolen. The Supreme Court concluded, with little discussion, that the agent's

conduct was sufficient, for purposes of Civ.R. 12(B)(6), to state a claim of intentional infliction of emotional distress.

{¶ 53} Finally, in *Nicolazzo*, 149 Ohio Misc.2d 44, 2007-Ohio-7269, 898 N.E.2d 94, the plaintiffs owed the defendant money for the purchase of a puppy. The plaintiffs alleged that the defendant "repeatedly called and e-mailed them, using threatening and outrageous language. The plaintiffs further allege that the defendant posted websites and other messages on the Internet that defamed the plaintiffs, including a copy of [a plaintiff's] driver's license and a mock wanted poster." Addressing the matter first under Civ.R. 12(B)(6), the trial court found that "whether the harm suffered by the plaintiffs in this case rises to the high standard required for a showing of intentional infliction of emotional distress is a jury question." *Id.* at ¶ 27. Considering the matter under Civ.R. 56, the trial court denied the motion due to the defendant's failure to present any evidence on this claim or to mention the claim in his motion. *Id.* at ¶ 28.

{¶ 54} None of the authority that Silvers cites persuades us that a genuine issue of material fact exists as to whether Scott's conduct was "extreme and outrageous." Unlike here, the plaintiff in *Stanfield* presented evidence that, when construed in her favor, supported a claim of retaliatory discharge; Silvers's claims fail to meet the standards for sexual harassment or sex discrimination. The allegations in *Reamsnyder* involved a threat of physical harm and a statement that the plaintiff's rental car had been reported to the police as stolen, thus implying that the plaintiff had been accused of a crime; these statements are factually distinguishable and more egregious than those before us. Finally, the allegations in *Nicolazzo*, though not well fleshed out, suggest on-going telephone and Internet harassment with "threatening

and outrageous" language. Scott's conduct, while embarrassing and upsetting to Silvers, did not rise to the level that current law requires.

{¶ 55} Silvers has presented evidence that, over the course of many months, Scott made several inappropriate comments to her. She presented evidence that he twice cursed at her, kicked a trash can toward her, made an extremely insensitive comment about her weight loss, and made other crude comments. Nevertheless, these actions simply do not reach the high legal standard required for "extreme" and "outrageous."

### V. Negligent Hiring and Retention

{¶ 56} Count Five of Silvers's second amended complaint alleged that "defendants had a duty to exercise reasonable care in the hiring and retention of Lieutenant VanGundy and Sergeant Scott." She alleged that VanGundy had a history of sexual harassment and that Scott had a history of committing acts of violence. Silvers did not address VanGundy in her response to the Clay Township Defendants' motion for summary judgment on this claim, and on appeal, she again focuses only on Scott. We will limit our discussion to Scott, as well.

{¶ 57} To establish a claim of negligent hiring or retention, a plaintiff must prove (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's actual or constructive knowledge of such incompetence, (4) the employee's act or omission causing the plaintiff's injuries, and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. *Sheldon v. Kettering Health Network*, 2015-Ohio-3268, 40 N.E.3d 661, ¶ 41 (2d Dist.); *see also Emswiler v. Bodey*, 2d Dist. Champaign No. 2012 CA 3, 2012-Ohio-5533, ¶ 53.

In the context of negligent hiring, supervision, or retention, liability on behalf of the employer results by way of its own negligence in selecting a person to employ or allowing a person to continue to work, where the employer, knows or should have known of the hired individual's violent or dangerous propensities. The focus of these claims is on the employer's knowledge of the hired individual's violent, criminal, or tortious propensities and whether such knowledge would have prevented the employment relationship. At a very minimum, a plaintiff must show that the employer knew or should have known of the hired person's criminal or tortious propensities. The foreseeability of a criminal act depends upon the knowledge of the employer, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are "somewhat overwhelming" that the employer will be liable. "The mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant * * * it is only where the misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed."

(Citations omitted.) *Jackson v. Hogeback*, 12th Dist. Butler No. CA2013-10-187, 2014-Ohio-2578, ¶ 34.

{¶ 58} In granting the Clay Township Defendants' motion for summary judgment, the trial court reasoned:

Plaintiff argues that Scott had a history of aggression that Clay Township overlooked before and after he was hired. Plaintiff asserts that

he was released from his probation by Brookville for being "too aggressive" and was not eligible for rehire. Plaintiff also cites an incident on May 2, 2012 where Scott pled guilty to disorderly conduct for pulling a gun on a dog at a dog park. Plaintiff argues that Clay Township knew about this history because Clay Township had his personal records.

Plaintiff cites to Scott's application for the Clay Township Police Department dated July 2, 2010 wherein the Brookville Police Department described Scott's work performance as "***active, aggressive patrol, good paperwork" and the word NO was circled as to the question "Would you rehire, if able?" The Court finds that this document does not create a dispute of fact as to Scott being competent. The document states he had "aggressive patrol" and that Brookville would not rehire him, but does not state anything that would call into question his competence.

Plaintiff also cites the Court to Clay Township Police Department Supervisor's Complaint Form dated May 3, 2012 where Scott was disciplined for an incident at a dog park where he drew his gun and later plead [sic] guilty to disorderly conduct for the incident. The Court does not find that this incident creates a dispute of fact as to Scott's competence. Further, the incident did not occur during a time where Scott was on duty.

The Court finds, based upon the evidence presented, that Plaintiff has failed to show that a dispute of fact exists that Scott was incompetent. The evidence presented does not show that he was incompetent. Further, Plaintiff has failed to show that a dispute of fact exists as to Clay Township's

knowledge of Scott's alleged incompetence. The Court finds that Defendants[ ] are entitled to summary judgment on this claim. Defendants' Motion for Summary Judgment is GRANTED as to this claim.

(Footnotes omitted.)

{¶ 59} Construing the evidence in the light most favorable to Silvers, the Clay Township Defendants were aware that Scott had previously been evaluated by the Brookville Police Department as too "aggressive." The documentation from Brookville or other evidence in the record did not explain what it meant by the term "aggressive," why the department had reached that conclusion, or provide any examples of aggressive conduct by Scott. Without more, this evidence does not establish that the Clay Township Defendants knew or should have known that Scott was incompetent to serve as a police officer or to supervise other officers. The Clay Township Defendants are entitled to summary judgment on a claim that they negligently hired Scott.

{¶ 60} Prior to Silvers' having issues with Scott, Scott was disciplined by CTPD for the incident at the dog park while Scott was off-duty. This incident, alone, does not create a genuine issue of material fact as to whether Scott was incompetent to be a police officer due to alleged aggressiveness. There is no evidence that Scott had a known history of aggressive or harassing behavior with co-workers, or that the Clay Township Defendants had actual or constructive knowledge that Scott had a propensity for engaging in the kind of behavior of which Silvers complains.

{¶ 61} The trial court did not err in granting summary judgment on Silvers's negligent hiring or retention claim.

**VI. Conclusion**

{¶ 62} Silvers's assignments of error are overruled.   The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P. J. and TUCKER, J., concur.


Copies mailed to:

Gregory Turner
Jeffrey C. Turner
Dawn M. Frick
Christopher T. Herman
Lawrence E. Barbiere
Katherine L. Barbiere
D. Patrick Kasson
Dave Vore
Lon Chambers
Steve Denlinger
Steve Woolf
Estate of Robin Lehman
Hon. Timothy N. O'Connell